BRADLEY R. CAHOON
bcahoon@swlaw.com
Idaho Bar No. 8558
Snell & Wilmer L.L.P.
Gateway Tower West
15 West South Temple, No. 1200
Salt Lake City, Utah 84101
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

M. REED HOPPER (*pro hac vice*)
mrh@pacificlegal.org
Cal. Bar No. 131291
DAMIEN M. SCHIFF (*pro hac vice*)
dms@pacificlegal.org
Cal. Bar No. 235101
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO, NORTHERN DIVISION

| | |
|---|---|
| CHANTELL and MICHAEL SACKETT, | ) Case No. 2:08-cv-00185-N-EJL |
| | ) |
| Plaintiffs, | ) |
| | ) **MEMORANDUM IN SUPPORT** |
| v. | ) **OF MOTION TO STRIKE** |
| | ) **MATERIALS FROM THE** |
| UNITED STATES ENVIRONMENTAL | ) **ADMINISTRATIVE RECORD** |
| PROTECTION AGENCY; et al., | ) |
| | ) |
| Defendants. | ) |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   I.   UNDER THE ADMINISTRATIVE PROCEDURE ACT, THE
       ADMINISTRATIVE RECORD SHOULD INCLUDE ONLY EVIDENCE
       THAT WAS CONSIDERED DIRECTLY OR INDIRECTLY BY THE
       DECISION-MAKER AT THE TIME THE DECISION WAS MADE . . . . . . . . . . . . . . . 7

  II.   THE JUNE, 2008, STREAM DATA AND JULY, 2008, MEMO, CREATED
       AFTER THE AMENDED COMPLIANCE ORDER, CONTAIN ADDITIONAL
       EVIDENCE THAT WAS NOT BEFORE THE DECISION-MAKER AND
       THUS SHOULD BE STRICKEN FROM THE ADMINISTRATIVE RECORD . . . . . . 10

 III.   THE MAY 15, 2008, FIELD NOTES AND JURISDICTIONAL
       DETERMINATION FORM SHOULD BE EXCLUDED
       BECAUSE IT IS IMPLAUSIBLE THAT THE AGENCY
       DECISION-MAKER CONSIDERED THEM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

 IV.   OLDER DOCUMENTS MENTIONED ONLY IN THE MAY 15 FIELD NOTES
       OR JURISDICTIONAL DETERMINATION FORM, OR THE JULY, 2008,
       MEMO, SHOULD BE EXCLUDED FROM THE ADMINISTRATIVE RECORD . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . 8-10

*Bar MK Ranches v. Yuetter*, 994 F.2d 735 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Califano v. Sanders*, 430 U.S. 99 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) . . . . . . . . . . . 7, 10, 14-15

*Cnty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . 10

*Dow AgroSciences, LLC v. Nat'l Marine Fisheries Serv.*, No. 11-2337,
2013 U.S. App. LEXIS 3650 (4th Cir. Feb. 21, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fund for Animals v. Williams*, 245 F. Supp. 2d 49 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . 10

*N. Cal. River Watch v. Wilcox*, 633 F.3d 766 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
448 F. Supp. 2d 1 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*,
415 F.3d 1078 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rapanos v. United States*, 547 U.S. 715 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3, 12

*Sackett v. EPA*, 132 S. Ct. 1367 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sackett v. EPA*, 622 F.3d 1139 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sackett v. EPA*, 677 F.3d 1000 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Sierra Club v. Marsh*, 976 F.2d 763 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Thompson v. U.S. Dep't of Labor*, 885 F.2d 551 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 8, 13

*United States v. Bailey*, 571 F.3d 791 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Walter O. Boswell Memorial Hospital v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984) . . . . . . . . . . 12

**Page**

*Wildearth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243 (D. Colo. 2010) . . . . . . . . . . 8

**Statutes**

5 U.S.C. § 701, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

33 U.S.C. § 1251, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   § 1251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   § 1319(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Energy and Water Development Appropriations Act, 1993,
   Pub. L. No. 102-377, 106 Stat. 1315 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Regulation**

40 C.F.R. § 230.3(s)(1)-(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Miscellaneous**

Webster's New International Dictionary (2d ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Wetlands Delineation Manual* (Jan. 1987), *available at*
   http://el.erdc.usace.army.mil/wetlands/pdfs/wlman87.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## INTRODUCTION

This case concerns the efforts (nearly six years and counting) of Plaintiffs Michael and Chantell Sackett to be allowed to build their family home without fear of punishment by Defendants Environmental Protection Agency, *et al.* (EPA).  The Sacketts seek review under the Administrative Procedure Act (APA), 5 U.S.C. § 701, *et seq.*, of an EPA compliance order that precludes the Sacketts from completing their homebuilding.  The Sacketts' APA claim contends that EPA's compliance order, issued under the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, is contrary to law and arbitrary and capricious, because the order exceeds EPA's statutory jurisdiction. Specifically, the Sacketts contend that their property contains no "waters of the United States," a necessary component of EPA's jurisdiction to issue the compliance order.

To adjudicate the Sacketts' claim, this Court must review the administrative record that supports the compliance order.  As demonstrated below, however, the record that EPA has filed is improper.  An agency record should contain only that information which the agency decision-maker relied on at the time of his decision.  Notwithstanding this well-established rule, EPA's purported record for this case contains many documents that the relevant agency decision-maker could not have considered, including memos, photos, and data about the Sackett property.  No basis exists to include these documents in the administrative record.  Therefore, as set forth below, the Court should strike these materials.

## LEGAL BACKGROUND

The Clean Water Act aims to restore and protect the Nation's "navigable waters." 33 U.S.C. § 1251(a).  The Act makes illegal a person's unpermitted discharge of a pollutant into "navigable waters."  *See id.* § 1311(a).  The Act defines "navigable waters" to mean the "waters of the United States."   EPA has interpreted "waters of the United States" to include various tributaries of

navigable waters, as well as certain classes of "wetlands."   40 C.F.R. § 230.3(s)(1)-(7).   To determine whether a property is a wetland, EPA and the United States Army Corps of Engineers use the latter's *Wetlands Delineation Manual* (Jan. 1987) [hereinafter "1987 Manual"], which usually requires three conditions: hydrophytic vegetation, hydric soils, and wetlands hydrology.[1]   *See* Energy and Water Development Appropriations Act, 1993, Pub. L. No. 102-377, 106 Stat. 1315, 1324 (1992); *United States v. Bailey*, 571 F.3d 791, 803 n.7 (8th Cir. 2009); 1987 Manual at 13-14. Further, a wetland must be sufficiently connected to "navigable waters" to fall within EPA's and the Corps' jurisdiction to regulate.

In *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court addressed which wetlands fall within Clean Water Act jurisdiction.  Justice Scalia, writing for himself and three other justices, authored a plurality opinion.  Justice Kennedy, writing for himself, concurred only in the judgment.   The split in the Court's opinion was over the extent to which Clean Water Act jurisdiction extends to nonnavigable waters and wetlands.  The plurality requires that a jurisdictional wetland have a "continuous surface connection," 547 U.S. at 742, to "relatively permanent" waters, which are defined as those waters that are ordinarily described as "'streams[,] . . . oceans, rivers, and lakes.'"  *Rapanos*, 547 U.S. at 739 (quoting Webster's New International Dictionary 2882 (2d ed.)). The connection from wetland to water must be such as to "mak[e] it difficult to determine where the 'water' ends and the 'wetland' begins."  *Id.* at 742.

In contrast to the plurality, Justice Kennedy's concurrence extends Clean Water Act jurisdiction to a wetland or nonnavigable water if it bears a "significant nexus" to a traditional navigable waterway, *i.e.*, a navigable-in-fact water.  A significant nexus is present if the wetland or water, either by itself or in combination with similar wetlands or waters in the same region,

---

[1] *Available at* http://el.erdc.usace.army.mil/wetlands/pdfs/wlman87.pdf.

significantly affects the physical, biological, and chemical integrity of the downstream traditional navigable waterway.  *See id.* at 780 (Kennedy, J., concurring).

Accordingly, under either the plurality or Kennedy standard,[2] for EPA to assert jurisdiction under the Clean Water Act, the agency must demonstrate a sufficiently significant connection to a traditional navigable waterway.  Facts about where a "wetland" is in relation to other waterways, and how that "wetland" affects other waters, are essential to the jurisdictional analysis.  Similarly relevant are facts about the "relative" permanence of any waters that supposedly connect wetlands to navigable-in-fact waters.

## FACTUAL BACKGROUND

The Sacketts own a small (0.63 acre) lot near Priest Lake, Idaho, on which they hope to build their family home.  Compl. for Declaratory and Injunctive Relief  ¶¶ 6, 23-24; *see* Document 20, letter from Mike and Chantell Sackett to EPA re:  Request for Information Pursuant to Section 308 of the Clean Water Act (July 5, 2007) (July 2007 letter), Administrative Record (AR) 00227 - 002234, 00227.  The lot is bounded to the north by Kalispell Bay Road, and to the south by Old Schneider Road.  A ditch (or "unnamed tributary") runs along the north side of Kalispell Bay Road.  Between Old Schneider Road and Priest Lake are several lots on which homes have been built.  *See* Document 35, memorandum from John M. Olson at EPA re: May 15, 2008 Site Inspection at Sackett Property with Attachments (July 1, 2008) (July 2008 memo), AR 00342, 00343, 00353.  Prior to purchasing the lot, the Sacketts completed the normal due diligence, including inspecting the property and researching permitting history and regulatory requirements.  *See* July 2007 letter at AR 00227 - 00228.  The Sacketts obtained no information that gave them any reason to believe that their

---

[2]  The Ninth Circuit has stated that jurisdiction may be proved under either *Rapanos* test.  *See N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 781 (9th Cir. 2011).

property contained wetlands regulated under the Clean Water Act.  *See id*. at 00227-00229.  Prior to commencing construction, they had obtained all required local permits.  *Id.* at 00228.  In late April, 2007, they began construction by placing gravel on the lot to prepare the site for the home's foundation.

A few days later, agents from EPA and the Corps came onto the property and verbally ordered the Sacketts' employees to stop construction, contending that they were filling in wetlands without a permit as required by the Clean Water Act.  *Id.*; *see* Document 15, memorandum from Carla H. Fromm re: Sackett Site Inspection Report (June 1, 2007), AR 00187.  The Sacketts immediately stopped all work on the site but attempted through the summer and fall of 2007 to resolve the dispute, in part by requesting from EPA a written explanation for its verbal stop-work order.  *See, e.g.*, Document 22, letter from Chantell Sackett to Carla Fromm (Aug. 24, 2007), AR 00236.  That explanation came in November, 2007, when EPA issued a compliance order, signed by Michelle Pirzadeh, then Director of EPA's Office of Ecosystems, Tribal, and Public Affairs, against the Sacketts.  *See* Document 23, letter and Administrative Compliance Order (Nov. 26, 2007) (2007 compliance order), AR 00237 - 00248.  The Clean Water Act authorizes EPA to issue a compliance order whenever it determines that, among other things, a person has illegally filled in a jurisdictional wetland.  *See* 33 U.S.C. § 1319(a)(3).  The Sacketts' order determined that they had illegally filled in jurisdictional wetlands without a permit.  The order required the Sacketts immediately to restore the property to its pre-disturbance condition in accordance with an attached Statement of Work.  The order threatened significant civil penalties for noncompliance.

Following receipt of the compliance order, the Sacketts' counsel sent a response to EPA contending that the order was illegal because the property contains no wetlands and, even if it does, the putative wetlands are not jurisdictional.  Document 27, letter from Leslie Weatherhead to EPA

re: In the matter of Chantell and Michael Sackett (April 1, 2008), AR 00261 - 00263.  The Sacketts

also requested an administrative hearing.  *Id.* at 00261.  Shortly thereafter, EPA responded by letter

to the Sacketts, reaffirming without explanation the agency's assertion of jurisdiction and refusing

an administrative hearing.  *See* Document 27, letter from Ankur K. Tohan to Leslie Weatherhead

re: In the Matter of Chantell and Michael Sackett (April 11, 2008), AR 00266.

## PROCEDURAL BACKGROUND

After EPA's rebuff, the Sacketts filed suit in this Court, challenging the compliance order

under the APA and the Fifth Amendment's Due Process Clause.  On May 15, 2008, Richard Parkin,

Acting Director of EPA's Office of Ecosystems, Tribal, and Public Affairs, issued an amended

compliance order from his Seattle office.  *See* Document 32, letter and Amended Administrative

Compliance Order (May 15, 2008), AR 00321 - 00329.  The only substantive difference between

the November, 2007, and May, 2008, compliance orders is that the latter withdraws the Statement

of Work and deadlines and instead simply imposes a general obligation to restore the property to its

pre-disturbance condition, coupled with a deadline for completion of initial restoration work.

*Compare id. with* 2007 compliance order, AR 00237 - 00248.

The next day, EPA moved to dismiss the Sacketts' action on the ground that EPA's

compliance order is not judicially reviewable.  On August 7, 2008, this Court granted EPA's motion

to dismiss, which the Ninth Circuit Court of Appeals affirmed.  *See Sackett v. EPA*, 622 F.3d 1139

(9th Cir. 2010).  On March 21, 2012, the United States Supreme Court reversed the Ninth Circuit,

holding that EPA's compliance order is reviewable under the APA.  *See Sackett v. EPA*, 132 S. Ct.

1367 (2012).  Accordingly, the Ninth Circuit remanded the case to this Court for adjudication of the

Sacketts' APA claim.  *See Sackett v. EPA*, 677 F.3d 1000 (9th Cir. 2012).

This Court subsequently issued a scheduling order and, pursuant to that order, EPA filed its certification of the administrative record on January 15, 2013. Notwithstanding the general rule that the administrative record must be limited to the materials that the agency decision-maker at least indirectly considered when the decision was made, EPA's record contains a number of items created *after* the May 15, 2008, compliance order. Further, the record contains many items that Directors Pirzadeh and Parkin evidently never considered.

For example, on May 15, 2008—the same day that Director Parkin signed the amended compliance order from his Seattle office and one day prior to EPA's motion to dismiss—an EPA ecologist, John Olson, visited the Sacketts' and neighboring properties from 12:30 p.m. until 6:00 p.m. *See* July 2008 memo at AR 00342. Apparently at that time, Mr. Olson filled out a Corps jurisdictional determination form and took field notes about his observations of the Sacketts' property as well as its purported connection to nearby streams and Priest Lake. *See* Document 33, May 15, 2008, Appendix B, Approved JD Form (JD form), AR 00330 - 00337; Document 31, May 15, 2008, Sackett Site (May 15 field notes), AR 00317 - 00320. Relying in part on these May 15 materials, Mr. Olson composed a significantly longer report, dated July 1, 2008. *See* July, 2008, memo. The July, 2008, memo contains numerous photographs taken on May 15, 2008, during the site visit. AR 00357 - 00370. It also includes information about the unnamed tributary to the north of the Sacketts' property, such as stream flow data from the United States Geological Service that were downloaded on June 23, 2008. *See* Document 34, USGS ID StreamStats data, AR 00338 - 00341. *See also* July, 2008, memo, AR 00344. Many facts from additional sources, and citations to those sources, including reports from the Idaho Department of Fish and Game and information about the area from several websites, also are found in the July, 2008, memo. These materials do

not appear to have been relied on by anyone at EPA prior to May 15, 2008, and the record contains

no indication that Director Parkin was aware of, much less considered, these materials.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) requires that agency action be reviewed based on

the "whole record" before the agency.  *See* 5 U.S.C. § 706.  Although an agency's certification of

the record enjoys a presumption of regularity, that presumption can be rebutted by clear evidence

showing that the certification is inappropriate.  *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th

Cir. 1993) ("The court assumes the agency properly designated the Administrative Record absent

clear evidence to the contrary."); *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of

Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006).  When an agency improperly includes information in

the administrative record, it should be stricken from the record if it causes prejudice to the opposing

party.  *See* 5 U.S.C. § 706 (requiring showing of prejudicial error); *Bar MK Ranches*, 994 F.2d at

740.

## ARGUMENT

## I

## UNDER THE ADMINISTRATIVE PROCEDURE ACT, THE ADMINISTRATIVE RECORD SHOULD INCLUDE ONLY EVIDENCE THAT WAS CONSIDERED DIRECTLY OR INDIRECTLY BY THE DECISION-MAKER AT THE TIME THE DECISION WAS MADE

The APA instructs a court reviewing an agency action to "review the whole record or those

parts of it cited by a party."  5 U.S.C. § 706.  The "whole record" should include neither more nor

less than what was before the agency decision-maker at the time the decision was made.  *Citizens

to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by

Califano v. Sanders*, 430 U.S. 99 (1977); *Pac. Shores Subdivision*, 448 F. Supp. 2d at 4.  Only the

evidence that the decision-maker considered directly or indirectly at the time the agency decision was made should be included. *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811-12 (9th Cir. 1980). Direct consideration means that the agency decision-maker reviewed the materials himself. Indirect consideration means that the agency decision-maker reviewed a synopsis of the materials prepared by a subordinate. *Wildearth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1256 (D. Colo. 2010) ("For example, if a party moves to include a study that was cited in the recommendations of subordinates, the party need not show that the decision maker read the study, but the party must show that the study was so heavily relied on in the recommendations that the decision maker constructively considered it."); *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 556 (9th Cir. 1989) (deciding that materials cited in a footnote of a motion that was considered by the agency Secretary was "either directly or indirectly" considered by the Secretary upon counsel's response to that motion).

The APA's "record review" rule supports the general administrative law principle that an agency must articulate a rational connection between the facts found and the decision made. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 415 F.3d 1078, 1093 (9th Cir. 2005). Such reasoning should be discernable from the record. *See id.* An agency is not permitted to defend its position on rationales or evidence that it did not consider when it made its decision. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Thus, post-decision information should be excluded from the record. *Ass'n of Pac. Fisheries*, 615 F.2d at 811-12.

Nevertheless, a court will sometimes allow the agency to provide a post hoc *explanation* of a rationale already in the record, in order to flesh out its reasoning at the time the decision was made.

*Sierra Club v. Marsh*, 976 F.2d 763, 772 (1st Cir. 1992).  Post hoc explanations should be permitted only when the administrative record fails to provide enough information by which to evaluate the agency's action.  *See Dow AgroSciences, LLC v. Nat'l Marine Fisheries Serv.*, No. 11-2337, 2013 U.S. App. LEXIS 3650, at **14-15 (4th Cir. Feb. 21, 2013).  Similarly, a court may allow additional studies, experts, or other information to help explain technically difficult matters in the record, so that the court may better understand and evaluate its content.  *Id.*  But new evidence and new rationales must be excluded.  *Ass'n of Pac. Fisheries*, 615 F.2d at 811-12; *Sierra Club v. Marsh*, 976 F.2d at 772-73.

In *Association of Pacific Fisheries*, the Ninth Circuit Court of Appeals explicated the differences between post hoc rationalization and post hoc explanation.  *See* 615 F.2d at 811-12.  There, a trade association representing canners and fish processors challenged the evidentiary basis for a new EPA rule.  *Id.* at 801.  In its argument, the trade association submitted three academic studies that pointed out statistical and analytical problems with the data collection that the EPA relied on in its rulemaking.  *Id.* at 811.  All three studies were publicly released only after the agency promulgated its rule.  *Id.*  The court determined that the studies were "helpful in understanding the problem faced by the Agency and the methodology it used to resolve it."  *Id.*  Accordingly, these materials were admissible to the "limited extent" that they served as "a clarification or an explanation of the original information before the Agency."  *Id.*  The court noted, however, that the proffered post-decision information was not admissible "as a new rationalization either for sustaining or attacking the Agency's decision."  *Id.* at 811-12.

Moreover, the record review rule does not allow information to be placed in the record simply because an agency employee was possessed of information that was relevant to the decision-making process.  Generally, only the information that was before the agency's

*decision-maker* when he rendered his decision should be included in the administrative record. *Volpe*, 401 U.S. at 420 ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision."); *Pac. Shores Subdivision*, 448 F. Supp. 2d at 5; *Fund for Animals v. Williams*, 245 F. Supp. 2d 49, 57 n.7 (D.D.C. 2003).[3]

## II

**THE JUNE, 2008, STREAM DATA AND JULY, 2008, MEMO, CREATED AFTER THE AMENDED COMPLIANCE ORDER, CONTAIN ADDITIONAL EVIDENCE THAT WAS NOT BEFORE THE DECISION-MAKER AND THUS SHOULD BE STRICKEN FROM THE ADMINISTRATIVE RECORD**

On June 23, 2008, more than a month after Director Parkin signed the amended compliance order, an agency employee (presumably EPA ecologist John Olson) looked up the stream data for the unnamed tributary that runs along the north side of Kalispell Bay Road, apparently for the purpose of adding that information to the July, 2008, memo.  *See* AR 00321 - 00329; *see* StreamStats AR 00338 - 00341.  Both documents were created after the compliance order was issued and thus are presumptively improper.  *See Ass'n of Pac. Fisheries*, 615 F.2d at 811-12.

Neither document falls under the "explanation" exception articulated in *Association of Pacific Fisheries*, which allows explanatory information but not new rationalizations.  Both documents add new evidence, not otherwise contained in the administrative record.  As stated above, the administrative record should only include that information which the agency decision-maker

---

[3]  At least one district court has held that information that is *damaging to the agency's position* and that was in the agency's possession at the time it made its order should be included in the record, regardless of whether the decision-maker considered that information.  *See Cnty. of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 76 (D.D.C. 2008) (information that contradicted the agency's position and that had been in the possession of the agency when the decision was made, was included in the record, whether or not the decision-maker considered that information, since it pertained to the reasonableness of the agency's action).  This circumstance is not present here, where EPA seeks to augment the proper record with information that supports its position.

considered at the time of his decision.  The stream data, which are dated more than a month after the amended compliance order issued, appear nowhere else in the administrative record except in the July, 2008, memo (*see* AR 00344).  There is nothing in the administrative record to indicate that this information was before the decision-maker (Director Parkin) on May 15, 2008, the day the amended compliance order was signed and dated. Accordingly, it should be stricken.

Likewise, Director Parkin could not have considered Mr. Olson's July, 2008, memo, which is dated more than a month after the agency amended its compliance order.  The memo goes well beyond a mere recordation of Mr. Olson's May 15, 2008, site visit.  It contains photos of the site taken by Mr. Olson during his site investigation, but these photos were not attached to either the site visit notes or to the jurisdictional determination form.  AR 00357 - 00370.  Moreover, pages 00344 through 00348 of the report are overwhelmingly comprised of facts and rationales that did not appear in the May 15 field notes or the jurisdictional determination form.

For example, the field notes assert that a significant nexus exists between alleged wetlands on the site and Priest Lake based on the wetlands' sediment trapping function.  AR 00318.  The memo, however, goes beyond "explaining" the asserted nexus by providing *new* evidence that the nexus exists, by discussing various studies and their findings.  AR 00346 - 00347.  Additional facts and rationales not appearing in the May 15 field notes or jurisdictional determination form include:

\*  Information about the Kalispell Bay Fen, its rank among 200 identified Idaho wetlands, and the fen's effect on traditional navigable waterways.  *See* AR 00345.

\*  Evidence about how fish health in Kalispell Creek is impaired by excessive sediment washing into the creek waters and on how wetlands help keep sediment out of the creek.  *See* AR 00348 - 00349.

- 11 -

\*    Information about how the Kalispell Bay Fen, of which the Sackett property is alleged to be a part, helps hold excess water in the peak runoff season.  *See* AR 00347 - 00348.

\*    Footnotes 1 through 20, which provide additional evidence and rationales supporting conclusions expressed in the field notes.  *See* AR 00344 - 00350.

The July, 2008, memo uses these facts to establish the "significant nexus" connection that Justice Kennedy's *Rapanos* concurrence requires for EPA to assert jurisdiction over the Sacketts' property. *See Rapanos*, 547 U.S. at 742, 780.  Accordingly, the July, 2008, memo is not a mere explanation; it is new evidence.[4]  Thus, to permit EPA to rely on the preexisting sources and information discussed in the July, 2008, memo would effectively allow the agency to dispense with its duty thoughtfully to consider facts *collected at the time of its decision*, and instead would authorize the agency to supplement the record with post hoc rationalizations.  *See Walter O. Boswell Memorial Hospital v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("To review more than the information before the Secretary at the time she made her decision risks our requiring administrators to be prescient or allowing them to take advantage of post hoc rationalizations.").  Such outcome would prejudice the Sacketts.  EPA could use these documents (if credited) to establish jurisdiction over the Sacketts' property and thereby support its compliance order.

Arguably, the information appearing in the July, 2008, memo was part of Mr. Olson's prior knowledge, and thus may have directly or indirectly affected Mr. Olson's May 15 field notes and jurisdictional determination.  Mr. Olson's personal knowledge, however, could not have directly or indirectly affected EPA's decision unless transmitted to Director Parkin.  Nothing in the existing administrative record indicates that Director Parkin, the decision-maker, possessed *any* of the

---

[4]  Even if the Court determines that the memo is just explanation, it is still improper for the same reasons that the other challenged documents are improper, namely, it is highly unlikely that the decision-maker considered the substance of the memo.

additional knowledge reflected in the June, 2008, stream gauge print-outs or July, 2008, memo. Further, nothing in the record suggests that Director Parkin had any knowledge whatsoever on May 15, 2008, about what Mr. Olson learned on his site inspection.  On May 15, Director Parkin had no opportunity directly or indirectly to consider evidence and rationalizations appearing in the July, 2008, report but nowhere else in the record.  Although the agency enjoys a presumption of regularity in compiling the record, that presumption is overcome here:  (1) the documents were prepared well after the decision was made; (2) the documents' substance goes well beyond mere explanation to offer new rationales and evidence; and (3) there is no evidence that the new rationales or evidence were actually considered by anyone in the agency, much less the decision-maker, when the amended compliance order was issued.

### III

### THE MAY 15, 2008, FIELD NOTES AND JURISDICTIONAL DETERMINATION FORM SHOULD BE EXCLUDED BECAUSE IT IS IMPLAUSIBLE THAT THE AGENCY DECISION-MAKER CONSIDERED THEM

As noted above, material does not belong in an administrative record simply because it was in the possession of some member of the agency at the time of the agency's decision.  *Thompson*, 885 F.2d at 556.  Rather, the agency decision-maker must have at least indirectly considered the material.  *Id.*  Here, it is highly unlikely that the field notes and jurisdictional determination form completed by Mr. Olson on May 15, 2008, were before the decision-maker, Director Parkin, at the time he signed the amended compliance order.  Director Parkin signed the order sometime on May 15, apparently from Seattle.  *See* Amended Administrative Compliance Order, AR 00321 - 00329 (with letterhead indicating the EPA's Seattle address).  Mr. Olson was at the Sacketts' property, hundreds of miles away, from 12:30 p.m. until 6:00 p.m.  *See* May 15 field notes, AR 00342.  Mr. Olson's field notes and the jurisdictional determination form were handwritten,

presumably while he was at the site.  *See id.*; *see also id.* at 00331.  It is improbable that Mr. Olson transmitted his handwritten field notes and jurisdictional determination form or their contents prior to finishing his site investigation at 6:00 p.m.  It is even less probable that Director Parkin waited into the evening for Mr. Olson's field notes to complete his evaluation to issue the amended compliance order.

There is no record evidence that the field notes, jurisdictional form, or any information therein—all of which (if credited) would be relevant to jurisdiction and therefore prejudicial to the Sacketts—was transmitted to Director Parkin at anytime on May 15, 2008.  The administrative record otherwise includes phone calls, emails, and handwritten notes involving the Sacketts' case. *See* Document 29, May 14, 2008, telephone conversation, AR 00269; Document 29, handwritten note from Jill Cobb, AR 00270; Document 13, May 30, 2007, email from Jill Cobb to Carla Fromm, AR 00175; Document 12, May 23, 2007, fax from Chantell Sackett, AR 00165.  EPA's employees obviously know how to document such communications, and EPA knows to place them in the record.  Thus, given this practice and the absence of such evidence relating to Director Parkin's indirect consideration of the May 15 materials, it is likely that no such consideration occurred.[5] Because a court must review an agency's decision based upon the reasoning of the decision-maker at the time he made his decision, the field notes and jurisdictional determination form should be stricken from the record.[6]  *See Volpe*, 401 U.S. at 420.

If the Court remains unsure about whether Director Parkin considered these materials at least indirectly, it should provide the Sacketts with the opportunity to depose Director Parkin to determine

---

[5]  If information from Mr. Olson's May 15 field inspection was transmitted through a phone call, email, or fax and influenced Director Parkin's decision, that information should have been included in the administrative record.  *See Volpe*, 401 U.S. at 420.

[6]  The July, 2008, memo and June, 2008, StreamStats data are also subject to exclusion on this basis.

whether he was familiar with the substance of the field notes and the jurisdictional determination form prior to issuing the amended compliance order.   *Id.* (remanding case to district court, instructing that the court may "require the administrative officials who participated in the decision to give testimony explaining their action").

**IV**

**OLDER DOCUMENTS MENTIONED
ONLY IN THE MAY 15 FIELD NOTES OR
JURISDICTIONAL DETERMINATION FORM, OR
THE JULY, 2008, MEMO, SHOULD BE EXCLUDED
FROM THE ADMINISTRATIVE RECORD**

The record contains historic aerial photos of the Sacketts' property from the United States Forest Service, AR 00271-00272, accompanied by a handwritten note, AR 00279.  The record establishes that Mr. Olson did not review these materials until the morning of his May 15, 2008, site visit.  *See* May 15 field notes, AR 00317; *see* AR 00269.  As already discussed, Mr. Olson then went to spend the duration of the working day (12:30 p.m. until 6:00 p.m.) at the Sacketts' property.  July, 2008, memo, AR 00342.  Director Parkin's indirect consideration of these materials is improbable for the same reasons that his consideration of the May 15 field notes and jurisdictional determination form are improbable.  Therefore, these materials should also be stricken.

Similarly, the website documents from May 14, 2008, should be excluded from the administrative record.  *See* Document 30, Priest Lake - Commerce websites, AR 00273 - 00316.  Although these documents antedate the decision, the only clear evidence in the record reflecting their consideration is the July, 2008, memo.  The same is true for Documents 1 through 8, which are cited only in the May 15 field notes or jurisdictional determination form, or the July, 2008, memo.  As already established, the administrative record should clearly communicate upon what facts the agency decision-maker based his decision.

It is implausible that these documents, which (if credited) would be relevant to jurisdiction and therefore prejudicial to the Sacketts, had any influence on the May 15, 2008, decision of Director Parkin.  Thus, they are improper as post hoc evidence.

## CONCLUSION

For the foregoing reasons, the Sacketts respectfully request that the Court strike from the administrative record:

Document 1:   Ecosystem Conservation Strategy for Idaho Panhandle Peatlands (Jan. 1, 1995)

Document 2:   Groundwater Thesis-Freeman (May 1995)

Document 3:   Field Inspection Report on August 7, 1996

Document 4:   NPW No. 961201150 (Aug. 9, 1996)

Document 5:   Priest River Subbasin Assessment and Total Maximum Daily Load

Document 6:   Idaho Wetland Conservation Prioritization Plan (Dec. 1, 2005)

Document 7:   Fisheries Management Plan 2007-2012 (2007)

Document 8:   Priest Lake - Jurisdictional Determination (Feb. 21, 2007)

Document 29: USFS 1932 aerial photos (May 14, 2008)

Document 30: Priest Lake - commerce websites

Document 31: Sackett site inspection 5-15-08 filed notes

Document 33: Sackett Site - Appendix B Approved JD Form (May 15, 2008)

Document 34: USGS ID StreamStats (June 23, 2008)

Document 35: Sackett site inspection 5-15-08 report with Attachments (July 1, 2008).

DATED:  April 5, 2013.

Respectfully submitted,

BRADLEY R. CAHOON
Snell & Wilmer L.L.P.

M. REED HOPPER
DAMIEN M. SCHIFF
Pacific Legal Foundation


By ___/s/ Damien M. Schiff_____
     DAMIEN M. SCHIFF
     Cal. Bar No. 235101
     *Pro Hac Vice*
     Telephone:  (916) 419-7111

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 5th day of April, 2013, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

>Bradley R. Cahoon, Attorney for Plaintiffs
>bcahoon@swlaw.com
>
>Nicholas J. Woychick, Attorney for Defendants
>Nick.Woychick@usdoj.gov
>
>Cynthia J. Morris
>c.j.morris@usdoj.gov
>
>Mark A. Ryan
>ryan.mark@epa.gov

>  /s/ Damien M. Schiff
>DAMIEN M. SCHIFF
>Attorney for Plaintiffs