UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CHANTELL and MICHAEL SACKETT, | |
| Plaintiffs, | Case No. 2:08-cv-00185-EJL |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; *et al.*, | ORDER |
| Defendants. | |

## INTRODUCTION

Pending before the Court in the above entitled matter are Plaintiffs' Motion to Strike, Plaintiffs' Request for Judicial Notice, and the parties' Cross-Motions for Summary Judgment. (Dkt. 70, 103, 105.) The matters are ripe for the Court's consideration. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. In the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Motions are decided on the record without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Chantell and Michael Sackett filed the Complaint in this matter seeking declaratory and injunctive relief under the Clean Water Act (CWA), 33 U.S.C. § 1251, *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq.* (Dkt. 1, 98.) The claims are made against Defendants the United States Environmental Protection

1 - ORDER

Agency (EPA) and the EPA Administrator. The parties dispute whether certain real property owned by the Sacketts in northern Idaho contains wetlands subject to the CWA.

The Sacketts own an undeveloped 0.63 acre dirt lot parcel located at 1604 Kalispell Bay Road in Bonner County, Idaho north of Priest Lake. The Sacketts purchased the lot in 2004 intending to build a home. In May of 2007, the Sacketts had obtained building permits from Bonner County and began preparations for building by removing material from the lot and placing sand and gravel on the building site to create a stable grade. EPA officers came to the site on May 3, 2007 and stated they believed the site contained wetlands subject to CWA regulations and directed that work on the home stop until a permit was obtained from the United States Army Corps of Engineers (USACE). On November 26, 2007, the EPA issued its initial Administrative Compliance Order (Compliance Order) formally concluding the Sacketts' property contains wetlands subject to CWA regulations and that the Sacketts had illegally placed fill material on the property. (Dkt. 1, Att. A) (AR 23.) The Compliance Order directed Plaintiffs to remove the fill material by April 15, 2008 and conduct other restoration measures by April 30, 2008. The Compliance Order stated that failure to comply may subject the Plaintiffs to administrative and civil penalties of up to $11,000 and $32,500 per day respectively.

Plaintiffs responded to the Compliance Order on April 1, 2008 contending the property is not a wetland nor subject to CWA jurisdiction. (Dkt. 1, Att. B) (AR 25.) The EPA disagreed with Plaintiffs' position but extended the deadlines for compliance to May 2008. (Dkt. 1, Att. C, D) (AR 26.)

2 - ORDER

On April 28, 2008, before the compliance deadline expired, Plaintiffs filed this action challenging the EPA's determination that the property is a wetland subject to CWA jurisdiction and seeking to declare the EPA's Compliance Order and amendments null and void. (Dkt. 1.) Thereafter, the EPA further extended the compliance deadlines.

On May 15, 2008, the EPA conducted a site visit to obtain additional research regarding its jurisdiction of the site. Following the site visit, but on the same day, the EPA issued an Amended Administrative Compliance Order (Amended Compliance Order) again concluding that the Sacketts' property contains wetlands subject to the CWA and directing Plaintiffs to remove the fill materials and replace the wetland soils. (AR 32.)

Defendants filed a Motion to Dismiss which was granted but later reversed on appeal and remanded for further proceedings. (Dkt. 21, 48, 49.) The case was then stayed at the request of the parties to facilitate settlement negotiations. (Dkt. 55, 57.) Those negotiations were unsuccessful and the case was reopened and a new scheduling order was entered. (Dkt. 61.)

Plaintiffs then supplemented their Complaint adding new related facts which occurred after the operative pleading was filed. (Dkt. 88, 90, 94, 98, 101.) Plaintiffs also filed a Motion to Strike portions of the Administrative Record, a Request for Judicial Notice, and Notices of Supplemental Authority. (Dkt. 70, 76, 86, 113, 115.) Both sides have filed Cross-Motions for Summary Judgment. (Dkt. 103, 105.) The Court finds as follows.

## DISCUSSION

3 - ORDER

1.      **Motion to Strike Materials From the Administrative Record**

Judicial review pursuant to the APA is based solely on the "whole" administrative record in existence at the time of the agency's decision. 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Friends of the Earth v. Hintz*, 800 F.2d 822, 828 (9th Cir. 1986). "The whole administrative record…consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. United States Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal citation omitted). That is to say, "'[t]he whole record' includes everything that was before the agency pertaining to the merits of the decision." *Portland Audubon Society v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).

This review is "generally limited to examination of the administrative record as it existed when the agency made the relevant decision." *Cascadia Wildlands Proj. v. United States Forest Serv.*, 386 F.Supp.2d 1149, 1158 (D.Or. 2005) (citations omitted); *see also Citizens to Preserve Overton Park*, 401 U.S. at 419 (Review is "based on the full administrative record that was before the Secretary at the time he made his decision."); *Camp v. Pitts*, 411 U.S. at 142; *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) ("review is limited to 'the administrative record already in existence, not some new record made initially in the reviewing court.'").[1]

---

[1] Plaintiffs' Notice of Supplemental Authority argues *San Luis* requires exclusion of *post-hoc* expert testimony. (Dkt. 86.) Defendants maintain judicial review is based on the administrative record and the agency can rely upon its experts. (Dkt. 87.) The Court reviewed these filings and caselaw and has applied the legal standards as stated herein.

Certain "narrow exceptions" allow supplementation of the administrative record with extra-record evidence in a few limited circumstances:

> (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency.

*Fence Creek Cattle Co. v. United States Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010); *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). Although post-decision information may be admissible to the extent it can be "deemed a clarification or an explanation of the original information before the [a]gency," the Ninth Circuit has made clear that parties may not use "post-decision information as a new rationalization either for sustaining or attacking the agency's decision." *Hintz*, 800 F.2d at 829 (quoting *Assn. of Pac. Fisheries v. EPA*, 615 F.2d 794, 811–12 (9th Cir. 1980)). Material outside the record may, however, be considered when it is needed to explain "technical terms or complex subject matter." *Sw. Ctr. Biological Diversity*, 100 F.3d at 1450; *see also Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977) (permitting extra-record evidence because it was "merely explanatory of the original record" and "[n]o new rationalization of the [agency's decision] was offered"); *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980) (Consideration of outside materials only for background information or to ascertain whether the agency "fully explicated its course of conduct or grounds of decision.").

The administrative record submitted by the government is entitled to a presumption of completeness which can be rebutted by clear evidence to the contrary. *Bar MK Ranches*

*v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *McCrary v. Gutierrez*, 495 F.Supp. 2d 1038, 1041 (N.D. Cal. 2007) ("An agency's designation and certification of the administrative record is…entitled to a presumption of administrative regularity."). Plaintiffs have the burden of rebutting the presumption of completeness by clear evidence. *Bar MK*, 994 F.2d at 740; *Pinnacle Armor, Inc. v. United States*, 923 F.Supp.2d 1226, 1232 (E.D. Cal. 2013).

On January 15, 2013, the Defendants filed the Administrative Record in this case. (Dkt. 62.) Plaintiffs seek to strike the following materials from the Administrative Record: 1) the July 2008 Memorandum, 2) the June 2008 StreamStats data, and 3) pre-decisional information. [2] Plaintiffs argue these materials were not considered by, within the knowledge of, nor before the agency decision-makers when the May 15, 2008 Amended Compliance Order was issued and, therefore, should be stricken. (Dkt. 70, 84.) Defendants maintain the items are properly included in the Administrative Record because the information was known to and considered by, either directly or indirectly, the decision-makers in issuing the Amended Compliance Order. (Dkt. 73.)

### A.    The July 2008 Memo

EPA wetland ecologist John Olson conducted the May 15, 2008 site visit of the Plaintiffs' property and neighboring properties to determine whether the property contained wetlands. (AR 31.) At the conclusion of the site visit, late in the day on May

---

[2] Plaintiffs' originally sought to strike fourteen documents but have withdrawn their objections to seven of the documents, namely: 3, 4, 8, 29-31, and 33. (Dkt. 70 and Dkt. 84 at 4, n. 1.) Plaintiffs now seek to strike only documents 1, 2, 5-7, 34, and 35. (Dkt. 70.) The Court previously took the Motion to Strike under advisement. (Dkt. 94.)

15th, Mr. Olson telephoned the EPA's Regional Counsel, Ankur Tohan, in Seattle, Washington to relay his findings and conclusions that the property did in fact contain wetlands and was subject to CWA jurisdiction. (Dkt. 73-3, Dec. Olson.) On the same day, Mr. Tohan discussed the matter with the then Acting Director of EPA's Office of Ecosystems, Tribal, and Public Affairs, Richard Parkin, who ultimately signed the Amended Compliance Order. (Dkt. 73-2, Dec. Parkin) (Dkt. 73-3.) The Declaration of Michael Szerlog, Mr. Olson's supervisor, further establishes that Mr. Olson's findings from the site visit were relayed to Mr. Parkin. (Dkt. 73-1, Dec. Szerlog.) Mr. Parkin's Declaration confirms he was briefed by staff and signed the Amended Compliance Order on May 15, 2008 "based on the recommendations of my staff." (Dkt. 73-2 at ¶ 4.)

Thereafter, on July 1, 2008, Mr. Olson completed a report (the "July 2008 Memo") memorializing his conclusions from the site visit. The Government included the July 2008 Memo in the Administrative Record. (AR 35.)

Plaintiffs argue the July 2008 Memo contains new after-the-fact data and rationales to justify the Amended Compliance Order and, therefore, should not be included in the Administrative Record. (Dkt. 70, 84.) Defendants maintain the July 2008 Memo is properly included because it summarizes Mr. Olson's May 15, 2008 site inspection and conclusions and is based on information either learned during the inspection or Mr. Olson's general knowledge and experience all of which was considered when deciding to issue the Amended Compliance Order. (Dkt. 73.) The Court finds the July 2008 Memo is properly included in the Administrative Record.

7 - ORDER

The July 2008 Memo is clearly a formalized summation of Mr. Olson's field notes which were made contemporaneously with the May 15, 2008 site inspection. (AR 31, 33, 35.) Mr. Olson relayed his findings and conclusions from the site visit to his superiors who, in turn, decided to issue the Amended Compliance Order based on those findings. (Dkt. 73-1, 73-2, 73-3.) The information contained and referred to in the July 2008 Memo was available at the time of the site inspection, part of Mr. Olson's general knowledge, and was considered by Mr. Olson as well as the EPA's decision-makers when they issued the Amended Compliance Order. *Thompson*, 885 F.2d at 555; *Nat. Res. Def. Council v. Gutierrez*, No. C 01-0421 JL, 2008 WL 11358008, at *6 (N.D. Cal. Jan. 14, 2008) (interpreting "all documents directly or indirectly considered" to encompass the underlying work and recommendations of agency subordinates). For these reasons, the Court denies the Motion to Strike the July 2008 Memo. Regardless, even without the July 2008 Memo, the EPA's determination in this case is supported by the record and was not arbitrary or capricious.

If the July 2008 Memo is included in the Administrative Record, Plaintiffs request to be allowed to submit a Declaration from Ray Kagel of his expert opinion regarding the EPA's determination. (Dkt. 84 at 9.) Defendants oppose the request, arguing the Declaration is Mr. Kagel's interpretation of the EPA's decision and characterization of certain documents and not properly included in the Administrative Record. (Dkt. 85.) The Court grants Plaintiffs' request.

Mr. Kagel's Declaration was completed May 24, 2013, years after the EPA's May

8 - ORDER

15, 2008 site visit, Amended Compliance Order, and July 2008 Memo. (Dkt. 84-1, Dec. Kagel.) It therefore is not part of the Administrative Record as material that was before the decision-maker at the time the Amended Compliance Order was issued. *Sw. Ctr. Biological Diversity*, 100 F.3d at 1450; *Wildearth Guardians v. United States Forest Serv.*, 713 F.Supp.2d 1243, 1256 (D. Colo. 2010) ("[A] party moving to complete the record must show with clear evidence the context in which materials were considered by decision makers in the relevant decision making process."). The Declaration does, however, fall within the "relevant factors" and technical/scientific explanation exceptions and may be properly considered for those limited purposes. *Fence Creek Cattle*, 602 F.3d at 1030.

Extra-record evidence may be admitted under the relevant factors exception "only to help the court understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious." *See San Luis*, 747 F.3d at 993. "[T]he exception does not permit district courts to use extra-record evidence to judge the wisdom of the agency's action" or as "a basis for questioning the agency's scientific analysis or conclusions." *Id*.; *see also Asarco*, 616 F.2d at 1160 ("Consideration of [extra-record] evidence to determine the correctness or wisdom of the agency's decision is not permitted."). Similarly, supplemental materials necessary to explain technical terms or complex subject matter may also be considered. *San Luis*, 747 F.3d 993.

In his Declaration, Mr. Kagel discusses the importance of following the USACE's 1987 Wetlands Delineation Manual's methodology when making a wetland determination and states the EPA failed to do so in this case. (Dkt. 84-1, Dec. Kagel.) Specifically, Mr.

9 - ORDER

Kagel states the EPA did not properly collect data concerning the soil's surface saturation, inundation, or ponding; excavate a soil pit to examine the soil saturation; or physically examine the property to determine if it had a peat layer at least 30 centimeters thick. The Court finds that information in the Declaration falls within the two narrow exceptions by providing background material and explanations of technical terms relating to the Court's evaluation of the integrity of the EPA's analysis in this case as to whether it considered all of the relevant factors and explained its decision. Therefore, the Court grants Plaintiffs request and has considered Mr. Kagel's Declaration for those limited purposes. The Court has not used Mr. Kagel's Declaration as a basis for questioning the correctness or wisdom of the EPA's analysis or conclusions. *Id.*

### B.     The June 2008 StreamStats Data

Plaintiffs seek to strike the June 23, 2008 StreamStats Ungaged Site Report from the Administrative Record, arguing it was not within the EPA's general or specific knowledge and is *post hoc* information. (Dkt. 84 at 4.)

The July 2008 Memo included flow data for an unnamed stream obtained from the United States Geological Survey's (USGS) web-based Geographic Information System site called "StreamStats." (AR 35 at 344.) Defendants included the StreamStats Report in the Administrative Record. (AR 34.) While the StreamStats Report was generated after the May 15, 2008 site visit, the Court finds the information used from StreamStates in the July 2008 Memo – i.e. the estimate mean annual flow data for an unnamed stream – was within the EPA's indirect or direct general knowledge at the time it issued the Amended

10  - ORDER

Compliance Order.

The StreamStats' data is an estimate of the stream's *annual* flow, not flow specific to June 23, 2008. The information simply provides detail to Mr. Olson's knowledge, field observations from the site visit, and conclusion that without the Kalispell Bay Road and the artificially constructed channel, the entire flow from the unnamed stream would have flown out of the south end of the Plaintiffs' property into Priest Lake. (AR 31, 34.) Regardless, even without the actual flow data from the StreamStats Report, Mr. Olson's field notes clearly demonstrate that he reached his conclusions regarding the stream's flow from the south end of the property during the site visit on May 15, 2008 and his Declaration establishes that he relayed the same to the decision-makers. (Dkt. 73-3) (AR 31.)

### C.    The Pre-Decisional Information in the July 2008 Memo

Plaintiffs seek to strike five documents from the Administrative Record which, they argue, are cited and/or discussed only in the July 2008 Memo but there is no indication the materials were considered by the decision-maker prior to issuing the Amended Compliance Order. (Dkt. 70, 84.) Defendants argue the documents are properly included because they were available to and considered, either directly or indirectly, by the decision-makers prior to and/or on May 15, 2008. (Dkt. 73.)

The documents in question are the 1995 Ecosystem Conservation Strategy for the Idaho Panhandle Peatlands, a 1995 Groundwater Thesis-Freeman, the Priest River Subbasin Assessment and Total Maximum Daily Load, the 2005 Idaho Wetland Conservation Prioritization Plan, and a Fisheries Management Plan for 2007 to 2012. (AR

1, 2, 5-7.) The materials are cited in the July 2008 Memo. (AR 35.) Mr. Olson states he consider these materials, along with other information, in reaching his conclusions which he conveyed to his supervisors who made the final decision to issue the Amended Compliance Order. (Dkt. 73.)

The Court finds these documents are properly included in the Administrative Record. They existed prior to and were either directly or indirectly relied upon by the EPA when it made its decision to issue the Amended Compliance Order. (Dkt. 73.) The Motion to Strike is denied as to these materials.

Relatedly, the parties agree to include two pages of the concluding section from the 1995 Groundwater Thesis-Freeman in the Administrative Record. (Dkt. 84 at 9) (Dkt. 85 at 2, n. 2.) The Administrative Record is therefore supplemented with those additional pages. (Dkt. 84, Att. B.)

## 2.     Requests for Judicial Notice

Plaintiffs have filed a Request asking the Court to take judicial notice of 1) the 1987 USACE's Wetland Delineation Manual (1987 Manual) and 2) the May 2010 Regional Supplement to the 1987 Manual. (Dkt. 76, 77.) The Defendants do not oppose the request. (Dkt. 85 at 2, n. 1.) Therefore, the Request for Judicial Notice is granted.

## 3.     Cross-Motions for Summary Judgment

In their Cross-Motions for Summary Judgment, the parties dispute whether the EPA correctly concluded that the Plaintiffs' property contains wetlands that are "waters of the United States" subject to CWA jurisdiction. Plaintiffs argue the EPA's determination is not

12 - ORDER

in accord with its guidelines and manuals and/or not supported by the Administrative Record. (Dkt. 103.) Defendants maintain the record supports their conclusion. (Dkt. 105.)

### A.    The Standard of Review

Judicial review of the EPA's decision in this case is governed by the APA, under which the Court may set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious where the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (citation omitted).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43. An agency's decision is valid where it considered the relevant factors and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the agency's conclusions. *Ctr. for Biological Diversity v. Natl. Highway Traffic Safety Admin*., 538 F.3d 1172, 1193 (9th Cir. 2008); *Nw. Ecosystem Alliance v. United States Fish & Wildlife Serv*., 475 F.3d 1136, 1145 (9th Cir. 2007) (citation omitted). The Court gives the most deference when reviewing an agency's technical analysis, judgment, and scientific determinations on

13  - ORDER

matters within its expertise. *Nat. Res. Defense Council, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016). It does not, however, "rubber-stamp...administrative decisions that [we] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Id.* (quoting *Ocean Advocates v. United States Army Corps of Engineers*, 402 F.3d 846, 859 (9th Cir. 2005)). Additionally, agencies are entitled to deference in their interpretation of their own regulations. *Siskiyou Reg. Educ. Proj. v. United States Forest Serv.*, 565 F.3d 545, 554-555 (9th Cir. 2009) (citations omitted). The Court's review of an agency's regulatory interpretation is to ensure the interpretation is not plainly erroneous or inconsistent with the regulation, even if the regulation is susceptible to more than one meaning.

APA claims may be resolved via summary judgment pursuant to the standard set forth in Rule 56. *See Nw. Motorcycle Assn. v. United States Dept. Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The APA requires that the agency action be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *League of Wilderness Defs. Blue Mnts. Biodiversity Proj. v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)).

## B. The Clean Water Act

The CWA was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and prohibits the discharge of pollutants,

14 - ORDER

including dredged or fill material, into "navigable waters" without a permit unless otherwise authorized under the CWA. 33 U.S.C. §§ 1251(a) and 1344. Section 404 of the CWA prohibits the discharge of "dredged or fill material" into navigable waters without a permit issued by the USACE. 33 U.S.C. § 1344. The EPA is authorized to issue administrative compliance orders requiring violators to comply with certain provisions of the CWA. 33 U.S.C. § 1319. Violators are also subject to significant criminal and civil penalties. *Id.* The EPA has jurisdiction under the CWA over "navigable waters."

The CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Agency regulations further interpret "waters of the United States" to generally include:

> • All traditional navigable waters, interstate waters, and the territorial seas;
> • All impoundments of jurisdictional waters;
> • All "other waters" such as lakes, ponds, and sloughs the "use, degradation or destruction of which could affect interstate or foreign commerce";
> • Tributaries of traditional navigable waters, interstate waters, the territorial seas, impoundments, or "other waters"; and,
> • Wetlands adjacent to traditional navigable waters, interstate waters, the territorial seas, impoundments, tributaries, or "other waters" (other than waters that are themselves wetlands).

33 C.F.R. § 328.3(a)(1)-(7); 40 C.F.R. § 230.3.[3]

### C.   The EPA Properly Concluded the Property Contains Wetlands Subject to CWA Jurisdiction

---

[3] In 2015, USACE and EPA proposed The Clean Water Rule (the "2015 Rule") which amended the definition of "waters of the United States." *See* 80 Fed. Reg. 37,054, 2015 WL 3930456 (Jun. 29, 2015) (to be codified at 33 C.F.R. § 328). The 2015 Rule and its effective date have been the subject of many legal challenges. *See Natl. Assn. of Mfrs. v. Dept. of Defense*, 138 S.Ct. 617 (2018); *Puget Soundkeeper Alliance, et al. v. Andrew Wheeler, et al.*, No. C15-1342-JCC (W.D. Wash. Nov. 26, 2018). The 2015 Rule is currently subject to a preliminary injunction in 28 states including Idaho. 84 Fed. Reg. 4154-01, 2019 WL 587080 (Feb. 14, 2019). Therefore, the pre-2015 Rule Regulations and Guidance are currently in effect in Idaho.

The EPA concluded the Sacketts violated § 301 of the CWA finding they are persons who discharged a pollutant from a point source into waters of the United States without the requisite permit. (AR 32.) Specifically, the EPA determined the Plaintiffs' property is subject to the CWA because it contains wetlands adjacent to Priest Lake, a traditionally "navigable water," and, additionally, their property is wetland adjacent to a tributary and similarly situated to other wetlands and has a significant nexus to Priest Lake. (AR 32.)

Plaintiffs challenge the EPA's determinations arguing their property is not a wetland subject to the CWA and, regardless, it is exempt from jurisdiction. (Dkt. 103, 109.) Defendants maintain the EPA's conclusions are correct. (Dkt. 105, 112.) For the reasons stated below, the Court finds the EPA's conclusions and determinations were not arbitrary or capricious and are supported by the record.

### 1.      Plaintiffs' Property Contains Wetlands

Wetlands are defined as "those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions" and they "generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3; 40 C.F.R. §§ 122.2 & 232.2; (AR 32.)

Plaintiffs argue the Administrative Record does not support the EPA's wetlands delineation here and that the EPA failed to use the diagnostic criteria required by the 1987 Manual. Defendants maintain the EPA's wetlands determination is supported in the record

16 - ORDER

and in accord with the 1987 Manual. The Court finds the EPA's determination was not arbitrary or capricious and is supported by the record.

The EPA's determinations and conclusions were made consistent with the 1987 Manual. (Dkt. 76-1, Ex. A) (Dkt. 77.) The 1987 Manual describes technical guidelines and methods using a multiparameter approach to identify and delineate wetlands for purposes of § 404 of the CWA. (Dkt. 76-1, Ex. A at vii, 1, 9-10.) When making wetland determinations "under normal circumstances," the manual directs the agency to consider and look for positive evidence of three parameters/indicators: hydrophytic vegetation, hydric soils, and wetland hydrology. (Dkt. 76-1, Ex. A at v, 3.) Where, however, land has been altered by recent human activities or natural events, the 1987 Manual provides alternative methods for making wetlands determinations. (Dkt. 76-1, Ex. A at 4, 73-82.) The EPA properly interpreted and employed the 1987 Manual's alternate wetlands determination method in this case.

Plaintiffs' property had clearly been altered due to recent human activities – namely the placement of fill material and possibly removal of vegetation and/or construction of a drainage system. (AR 10, 11, 12, 15, 21, 31, 35.) The EPA therefore correctly used the alterative procedures to examine the property for the presence of the three wetlands parameters in making its determination. (Dkt. 76-1, Ex. A at 75-82) (removal of vegetation: aerial photography, onsite inspection, previous site inspections, adjacent vegetation, public); (soils: recent presence of fill material, removal of surface soil, soil surveys, prior soil data); (hydrology: ditching/channels/diversions, prior hydrology of the area, field

17 - ORDER

indicators, aerial photography, historical records, public) (AR 10, 11, 15, 31, 33, 35.). The EPA conducted a site-specific field examination of the property and its findings and conclusions were made in accord with the applicable standards and procedures for making wetlands determinations. *Id.* Moreover, the EPA explained its conclusions and fully considered all of the relevant factors consistent with making the wetlands determination including its findings concerning the presence of the wetlands indicators and parameters as directed by the 1987 Manual.

The EPA's determination that Plaintiffs' property is a wetland is reasonable and supported by the materials in the Administrative Record. Plaintiffs' property was originally part of a large wetland complex called the Kalispell Bay Fen. (AR 10, 12, 29, 31, 35, 39.) That complex is now divided by Kalispell Bay Road. (AR 10, 11, 15, 21, 31, 35.) North of the road, the wetland remains mainly undisturbed. (AR 10.) Plaintiffs' property is located south of the road and has now been mostly filled and removed of vegetation. (AR 10, 11, 15.) During the EPA's field visits to Plaintiffs' property, however, the EPA personnel were still able to observe the presence of the three wetlands indicators. (AR 15, 31, 35.) The areas of the property where native soil had been removed but not yet filled were inundated/saturated/ponded evidencing that the hydrology of the site was consistent with wetlands. (AR 15, 31.) EPA inspectors also observed strips of land on the property that had not yet been filled which revealed the presence of wetland soils. (AR 10, 11, 15, 21, 31.) There is also evidence of a shallow subsurface flow between the wetlands north of Kalispell Bay Road and the Plaintiffs' property. (AR 31, 35.) Further, the land abutting Plaintiffs'

18  - ORDER

property to the east and west are properties with evident wetland characteristics; including wetland vegetation. (AR 10, 15, 21.) The land north of Kalispell Bay Road also contains wetland vegetation. (AR 15, 31.) These findings support the EPA's conclusion that Plaintiffs' property is a wetland.

Based on the foregoing, and as discussed elsewhere in this Order, the Court finds the EPA's determination that the property contains wetlands was not arbitrary or capricious and is supported by the materials in the Administrative Record.

### 2.   Plaintiffs' Property is Adjacent to a Traditional Navigable Water

Defendants argue Plaintiffs' property is a "water of the United States" because it is a wetland adjacent to a traditional navigable body of water; namely, Priest Lake. Plaintiffs contend their property is not adjacent to Priest Lake because it is separated by dry land containing a road and a developed residential neighborhood. Plaintiffs further assert the EPA's interpretation of the definition and regulations for adjacency are erroneous and not entitled to deference.

The Administrative Record supports the EPA's determination that Priest Lake is a traditional navigable water. A "traditional navigable water" includes "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 33 C.F.R. § 328.3(a)(1). Priest Lake has been and is used in interstate commerce. (AR 31, 35.)

The Administrative Record also supports the EPA's conclusion that Plaintiffs' land is adjacent to Priest Lake. "Adjacent" is defined as "bordering, contiguous, or neighboring"

19 - ORDER

a water previously identified as a "water of the United States" including waters separated by "constructed dikes or barriers, natural river berms, beach dunes, and the like." 33 C.F.R. § 328.3(c)(1); 40 C.F.R. §§ 230.3 & 232.2. The EPA interprets that definition using an EPA Guidance Document issued on December 2, 2008 (Guidance Document) which applies Supreme Court caselaw to the definition of "waters of the United States." *See* Clean Water Act Jurisdiction Following the U.S. Decision in *Rapanos v. United States & Carabell v. United States*, (Dec. 2, 2008).[4]

Under the Guidance Document, wetlands are considered "adjacent" where one of three criteria are satisfied: 1) they have an unbroken surface or shallow sub-surface connection to jurisdictional waters, even if intermittent; 2) they are physically separated from jurisdictional waters by man-made barriers and the like; or 3) their proximity to a jurisdictional water is reasonably close so as to support a science-based inference of an ecological interconnection. *See* Guidance Document at 5-6. The EPA argues all three criteria are present here. The Court finds the EPA's interpretation, application, and determination of "adjacency" as to the Plaintiffs' property here was reasonable and supported by the record.

As to the first criteria, the record supports EPA's conclusion that there is a shallow subsurface connection between Plaintiffs' wetlands and Priest Lake. (AR 11, 15, 21, 31,

---

[4] Plaintiffs' Second Notice of Supplemental Authority argues an October 2016 Regulatory Guidance Letter (No. 16-01) supersedes prior guidance documents and is binding on the USACE. (Dkt. 115.) The Court disagrees. The current guidance document is dated December 2, 2008 and can be found at: https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf.

35.) The field inspections showed Plaintiffs' property is elevated above Priest Lake with a sufficient flow-gradient slope and highly permeable soil making it reasonable to conclude water flows from Plaintiffs' property downgradient to Priest Lake. The field notes further show the presence of high groundwater, indicative of the wetland's shallow subsurface connection to a downgradient waterbody, and drainage pipes to the south providing flow directly into Priest Lake. The property is also part of a larger wetlands complex that historically drained directly into Priest Lake but now does so through visible drainage mechanisms commonly used to discharge groundwater to a downgradient waterbody. (AR 11, 15, 21, 31, 35.)

As to the second criteria, the record supports the EPA's adjacency determination despite there being dry land to the south of Plaintiffs' property separating it from Priest Lake. The Old Schneider Road and residential properties lie between Plaintiffs' property and Priest Lake. Plaintiffs' property and the lake, however, do not have to be directly abutting in order to be "adjacent." "Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 C.F.R. § 328.3(c); 40 C.F.R. § 230.3; *see also* Guidance Document at 5. Here, the photographs, maps, field observations, and other materials contained in the record show the entire wetlands complex, which historically included Plaintiffs' property, extended to Priest Lake. (AR 10, 15, 29, 31, 35-39.) Plaintiffs' property is now physically separated from the lake only by man-made barriers. The record shows that without the man-made barriers, water would flow from the property directly
21  - ORDER

into Priest Lake. In addition, there is a strong indication of a shallow subsurface flow from Plaintiffs' property to Priest Lake through the drainage pipes.

Finally, as to the third criteria, the EPA reasonably concluded the Plaintiffs' property is "reasonably close" and, therefore, adjacent to Priest Lake. Plaintiffs' Property is located only 300 feet from the shore of Priest Lake. *See* 33 C.F.R. § 328.3(c); 40 C.F.R. § 230.3 (Adjacent includes lands that are "neighboring."). It is also higher than Priest Lake and with evidence of a clear shallow subsurface flow from Plaintiffs' property downgradient into Priest Lake. The record, therefore, supports the EPA's conclusion that the reasonably close proximity of Plaintiffs' property to Priest Lake gives rise to a science-based inference that Plaintiffs' wetlands have an ecological interconnection with the jurisdictional waters of Priest Lake. Guidance Document at 5-6; (AR 15, 31, 35.)

The EPA's determination that the property is adjacent to Priest Lake is reasonable and supported in the record. Because Plaintiffs' property is a wetlands adjacent to Priest Lake, a traditional navigable water, the EPA's conclusion that it has jurisdiction under the CWA is not arbitrary or capricious.

### 3. Plaintiffs' Property is Adjacent to a Jurisdictional Tributary and Similarly Situated with Other Wetlands that Together Have A Significant Nexus to Priest Lake

Defendants assert the EPA correctly determined the property is also subject CWA jurisdiction because it is adjacent to a jurisdictional tributary and similarly situated with other wetlands that, together, have a significant nexus to Priest Lake. Plaintiffs disagree arguing their property is not adjacent to a tributary or similarly situated to other wetlands

22  - ORDER

nor is there a significant nexus with Priest Lake.

> **a.    Plaintiffs' Property is Adjacent to a Jurisdictional Tributary and Similarly Situated with Other Wetlands**

The EPA concluded the Plaintiffs' property is adjacent to an unnamed tributary that flows into Priest Lake and is similarly situated with other wetlands. The EPA's conclusion is reasonable and supported by the Administrative Record.

North of Plaintiffs' property is the Kalispell Bay Fen which is a large wetlands complex that drains into an unnamed tributary running along the north side of Kalispell Bay Road, to Kalispell Creek, and then to Priest Lake. (AR 31, 33, 35, 36.) Prior to the construction of the road and tributary, the Kalispell Bay Fen was a unified wetlands complex that extended to Priest Lake and included Plaintiffs' property and the wetlands abutting Plaintiffs' property on the east and west. (AR 6, 15, 29, 31, 35, 39.) As discussed throughout this Order, the record shows evidence of hydrological and ecological connections between Plaintiffs' property, the surrounding wetlands, and the tributary which support the EPA's conclusions of adjacency and similarly situated wetlands.

Plaintiffs' property is physically separated from the tributary to the north by Kalispell Bay Road but is "reasonably close" in proximity being only thirty feet away. 33 C.F.R. § 328.3(c); 40 C.F.R. § 230.3; Guidance Document at 5-6. The road and tributaries are "man-made barriers" that do not defeat adjacency. *Id.* Further, Plaintiffs' property remains hydrologically connected to the wetlands despite the construction of the road and tributary through a shallow subsurface flow. The photographs, maps, and field observations

in the Administrative Record show the presence of high groundwater on Plaintiffs' property indicative of a shallow subsurface flow connecting it to the other wetlands as well as evidence of wetland soils and vegetation similar to the abutting wetlands. (AR 15, 21, 31, 35, 36, 39.) Without the construction of the tributary and road north of Plaintiffs' property, the entire flow from the wetlands complex historically did and would still flow out of the south end of Plaintiffs' property into Priest Lake. (AR 6, 15, 29, 31, 33, 35, 39.) For these reasons, the Court finds the Administrative Record supports the EPA's conclusion that Plaintiffs' property is adjacent to the tributary and/or similarly situated to other wetlands.

### b.      There is a Significant Nexus to Priest Lake

The EPA concluded Plaintiffs' property is subject to CWA jurisdiction because it, and other similarly situated wetlands and adjacent jurisdictional tributaries, have a significant nexus to Priest Lake. The Court finds the EPA's determination was not arbitrary or capricious and is supported by substantial evidence in the Administrative Record.

In determining whether wetlands that are isolated or adjacent only to a non-navigable tributary of a navigable waterway constitute "waters of the United States," the Court applies the "significant nexus test." *See Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999 (9th Cir. 2007).[5] Under that test, CWA jurisdiction over wetlands "depends

---

[5] Plaintiffs' arguments to the contrary have been rejected. (Dkt. 113); *see United States v. Robertson*, 875 F.3d 1281 (9th Cir. 2017) ("*City of Healdsburg* remains valid and binding precedent."); *United States v. HVI Cat Canyon, Inc.*, 314 F.Supp.3d 1049, 1057 (C.D. Cal. 2018).

upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense." *Rapanos v. United States*, 547 U.S. 715, 779 (2006) (J. Kennedy concurring).

> [A] significant nexus exists "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters."

*City of Healdsburg*, 496 F.3d at 1000 (quoting *Rapanos*, 547 U.S. at 779–80). Thus, to be a water subject to regulation under the CWA, the water or wetland must possess a "'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Rapanos*, 547 U.S. at 759. The test has been extended to tributaries. *See United States v. Robertson*, 875 F.3d 1281, 1293 (9th Cir. 2017).

The EPA's significant nexus determination here is not arbitrary or capricious. Substantial evidence in the record shows that Plaintiffs' property, the adjacent tributary, and the similarly situated wetlands have significant physical and biological impacts on Priest Lake. (AR 31, 33, 35.) The Kalispell Bay Fen wetland complex, which Plaintiffs' property was historically part of and remains connected to, is rare in northern Idaho and provides significant hydrological, biological, and ecological influences on Priest Lake by contributing to base flow; providing flow augmentation and flow attenuation; improving water quality through sediment retention which benefits fish; providing invertebrate inputs supporting fish and wildlife species; and improving fish movement. (AR 31, 35.)

25 - ORDER

The record establishes the existence of a hydrologic connection in the form of a substantial shallow subsurface flow between the wetlands, Plaintiffs' property, the adjacent tributary and the lake which significantly improves the physical, biological, and ecological integrity of Priest Lake. (AR 31, 33, 35.) Plaintiffs' property, the wetlands, and the tributary all lie at a higher elevation than the lake with a sufficient gradient for drainage from those areas down into the lake. (AR 31, 35.) The highly permeable soil surrounding the lake facilitates the groundwater drainage. During the field visit, the EPA observed substantial flow through the outlet stream north of the road into Kalispell Creek; high groundwater indicating a subsurface connection to a downgradient waterbody; and drainage pipes south of the property discharging groundwater into the lake. (AR 31, 33, 35.) Historical records also show flows from the wetlands complex went into the lake. (AR 14, 21, 31, 32, 33, 35, 36.)

This hydrologic connection significantly impacts Priest Lake by contributing base flow and improving water quality through sediment retention and nutrient uptake to runoff before it moves through the shallow subsurface flow into the lake. (AR 31, 35.) It also provides flow attenuation by retaining runoff and upstream shallow groundwater flow during high flow periods which are released slowly into the lake. (AR 31, 35.)

There are also significant impacts on the biological and ecological characteristics of the lake through improved habitat and lifecycle support functions for fish and other species, increased water quality, and enrichment of the foodweb. During the field visit, the EPA observed trout and beaver activity in the adjacent outlet stream and creek, noting the

26 - ORDER

presence of habitat for fish/spawn areas as well as substantial aquatic and wildlife habitat diversity. (AR 31, 33, 35.) The connectivity established in the record between the outlet stream, Plaintiffs' property, and the abutting wetlands to Priest Lake serves important functions in the form of fish movement to and from the lake, contributions to base flow with fisheries benefit, and providing substantial invertebrate production which supports the fish, wildlife, and overall foodweb for species in the area. (AR 31, 33, 35.)

Based on the foregoing, the Court finds the record supports the EPA's determination that Plaintiffs' property, adjacent tributary, and the similarly situated wetlands have a significant nexus to Priest Lake. The physical, hydrological, biological, and ecological impacts and connections established in the record provide significant and "critical functions" to the integrity of Priest Lake by improving water quality, flow attenuation, and benefits to fish and wildlife. *See Rapanos*, 547 U.S. at 779. Therefore, the EPA's conclusion that Plaintiffs' property is subject to CWA jurisdiction was not arbitrary or capricious and is supported by substantial evidence in the record.

### 4.    Other Adjacent Wetlands Do Not Exempt Plaintiffs' Property

Plaintiffs contend that even if the property has wetlands, their property is excluded from the definition of jurisdictional wetlands because the land is adjacent to other wetlands; i.e., the Kalispell Bay Fen. (Dkt. 103.) Defendants counter arguing the existence of other adjacent wetlands does not negate CWA jurisdiction. (Dkt. 105 at 27.)

Plaintiffs rely on the language in the regulation's definition of the term "waters of the United States" which includes "wetlands adjacent to waters (other than waters that are

27 - ORDER

themselves wetlands.)" 33 C.F.R. § 328.3(a)(7) (emphasis added); 40 C.F.R. § 230.3(s)(7).

Plaintiffs' argument, however, has been rejected. *Universal Welding & Fabrication, Inc. v. United States Army Corps. of Engineers*, No. 4:14-cv-00021, 2015 WL 12661934 (D. Alaska Oct. 1, 2015) *affirmed by* 708 Fed. Appx. 301 (9th Cir. 2017). While this Court is not bound by the *Universal Welding* decision, the Court agrees with its reasoning and conclusion that the correct interpretation of the regulation's definition is that jurisdiction cannot be based solely on adjacency to another wetland; not, as Plaintiffs argue, that adjacency to other wetlands is an exclusion or exception to jurisdiction.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1)     Plaintiffs' Motion to Strike (Dkt. 70) is **DENIED**.

2)     Plaintiffs' Requests for Judicial Notice (Dkt. 76) is **GRANTED**.

3)     Plaintiffs' Motion for Summary Judgment (Dkt. 103) is **DENIED**.

4)     Defendants' Motion for Summary Judgment (Dkt. 105) is **GRANTED**.

DATED: March 31, 2019

Honorable Edward J. Lodge
U.S. District Judge